J-A20010-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF: K.M.L | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 164 WDA 2020 |

Appeal from the Decree Entered December 30, 2019
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
108 In Adoption 2019


BEFORE:   BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    FILED NOVEMBER 13, 2020

E.S. ("Mother") appeals from the December 30, 2019 decree terminating her parental rights to her daughter, K.M.L.[1]  We affirm.

K.M.L. was born in July 2010.  The Erie County Office of Children and Youth ("OCY") has been involved with the family since 2015, based upon concerns that Mother and her paramour abused and neglected K.M.L. and her younger half-brother, C.B.[2]  In 2016, K.M.L. was diagnosed with attention deficit hyperactivity disorder and anxiety disorder.  Similarly, she presents

_____

[1] As the child's father, S.H., is deceased, he was not a party to the involuntary termination proceedings or this appeal.

[2] The agency did not petition to terminate Mother's rights to C.B., who was returned to the care and custody of his biological father during May or June of 2019.

with trauma and significant bonding and attachment problems. She also exhibits substantial behavioral issues, including acting out sexually. OCY provided the family in-home services for approximately two years, and on May 23, 2017, the juvenile court adjudicated K.M.L. dependent due to Mother's failure to follow through with services, and ongoing concerns over domestic violence.

K.M.L. remained in the home until October 1, 2018, when OCY obtained an emergency protective order placing the child in the agency's physical custody. In addition to Mother's continued neglect of the children, their removal stemmed from suspicious[3] bruising around K.M.L.'s eye and unexplained second-degree burns on the palm of K.M.L.'s hand.

The orphans' court succinctly summarized Mother's engagement with the agency over the ensuing year as follows:

> At the time of the [February 4, 2019 permanency review] hearing, [Mother] appeared with counsel. During this review period, the Court found [Mother] had been minimally compliant with the permanency plan, and there was minimal progress toward alleviating the circumstances which necessitated the original placement of the minor child. [Mother] participated in supervised visits with the child, but continued to be inconsistent and had a difficult time engaging with the minor child, requiring redirection from inappropriate discussions with the child. [She] presented at one supervised visit with a swollen and bruised nose, and a report was received on November 8, 2018, regarding ongoing domestic

---

[3] Although Mother claimed that the black eye was the result of K.M.L. wrestling with C.B., the agency was concerned because K.M.L. had a history of similar injuries under suspicious circumstances. Indeed, Mother previously claimed that three separate black eyes were the result of KML running into doorknobs.

violence in the home of Appellant and her paramour, K.B. The [c]ourt ordered that the minor child was to remain in temporary foster care. . . .

[Having moved from Erie County to Union County[4] the previous month, Mother] failed to appear for the scheduled hearing [on August 5, 2019,] but her interests were represented by counsel. During this review period, [Mother] continued to be minimally compliant with [c]ourt ordered services. [She] continued to display a negative attitude towards the minor child[, and] . . . failed to actively participate in any of the services offered to her. Of great concern, [Mother] continued to reside with her paramour, K.B., who was an indicated perpetrator of sexual abuse[against K.M.L.[5]] and who had been alleged to have hit the minor child in the face on three occasions, resulting in black eyes. The [c]ourt ordered that the minor child was to remain in foster care. Further, the [c]ourt ordered the permanent placement goal for the minor child to be changed to [a]doption. It was ordered that OCY was to no longer offer any services to the mother, including visitation. . . .

On October 4, 2019, OCY filed a Petition for Involuntary Termination of Parental Rights (hereinafter "IVT Petition"), seeking to terminate the parental rights of Appellant pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and §2511(b).

Trial Court Opinion, 2/28/20, at 4-5.

---

[4] Mother neglected to request that the juvenile court transfer services to Union County. N.T., 12/16/19, at 14. She has not contacted the child or the agency since relocating, although she reportedly vowed to "fight to get her daughter back." Id. at 15.

[5] Highlighting that the authorities did not charge K.B. for sexual assault, Mother committedly defended her paramour, even referring to K.M.L. as "a little liar." N.T., 12/16/19, at 12, 45-46.

During the ensuing evidentiary hearing, Alison Scarpitti, Esquire represented K.M.L.'s legal interest pursuant to 23 Pa.C.S. § 2313(a).[6] Mother, who was represented by counsel, participated by telephone and stipulated to the admission of the July 2019 bonding assessment performed by Peter von Korff, Ph.D. and a July 17, 2019 report from Erie Homes for Children and Adults/Project First Step. OCY presented the testimony of Mary Bliley, the family's caseworker, and Nicole Seelbach, the child's permanency caseworker. In sum, Ms. Bliley testified: 1) Mother failed to address the concerns that necessitated the child's placement; 2) termination of Mother's parental rights would serve K.M.L.'s best interest; and 3) severing the parent/child bond would not affect the child negatively. Similarly, Ms. Seelbach testified that the termination of Mother's parental rights would serve the child's best interest, again without negative effect, even though an adoptive resource has not been identified. She observed that then-ten-year-old K.M.L. has a committed desire to be adopted by "a forever home . . . that will love her." N.T. 12/16/19, at 33.

_____

[6] Attorney Scarpitti informed the court that she discussed the case with K.M.L., who desires to be adopted, and advised the court that she was able to represent the child's legal interests and best interest without conflict. N.T., 12/16/19, at 58-59. See In re Adoption of L.B.M., 161 A.3d 172, 175, 180 (Pa. 2017) (plurality) (pursuant to 23 Pa.C.S. § 2313(a), child subject of contested involuntary termination proceeding has statutory right to counsel who discerns and advocates for the child's legal interests). Attorney Scarpitti filed a brief in this Court in support of the orphans' court decree terminating Mother's parental rights.

On December 16, 2019, the orphans' court granted OCY's petition to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and § 2511(b). Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal challenging the trial court's determinations under subsections (a)(2), (a)(5), (a)(8), and §2511(b). She reiterates those issues on appeal as follows:

> A. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?
>
> B. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's brief at 3.[7]

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an

_____

[7] Mother's challenge as to subsection (a)(1) is waived because she failed to preserve this claim in her Rule 1925(b) statement and the orphans' court did not address it. See Krebs v. United Refining Co., 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [9 A.3d 1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Significantly, since this Court may affirm the orphans' court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a) as well as (b), see In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc), and because Mother waived her challenge to the orphans' court's conclusion that OCY proved the statutory grounds outlined in § 2511(a)(1), we need only address the court's 2511(b) analysis.

The pertinent subsection of the Adoption Act provides as follows:

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

In relation to the needs and welfare analysis, this Court observed,

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011) (cleaned up).

After a thorough review of the certified record, the pertinent briefs, and the pertinent law, we affirm the involuntary termination decree on the basis of the cogent and well-reasoned opinion entered on February 28, 2020, by the Honorable John J. Trucilla. Specifically, President Judge Trucilla concluded that OCY presented clear and convincing evidence that terminating Mother's

parental rights would best serve K.M.L.'s developmental, physical, and emotional needs and welfare pursuant to § 2511(b). Orphans' Court Opinion, 2/28/20, at 13-15. We adopt President Judge Trucilla's reasoning as our own.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2020

IN THE MATTER OF            :       IN THE COURT OF COMMON PLEAS
THE ADOPTION OF            :       OF ERIE COUNTY, PENNSYLVANIA
K.M.L.            :

           :       ORPHAN'S COURT

APPEAL OF E.M.S.,            :
Natural Mother            :       NO. 108 IN ADOPTION, 2019

## 1925(a) OPINION

This matter is before the Court upon the appeal of E.M.S. (hereinafter "Appellant") from the Order of December 30, 2019, terminating Appellant's parental rights.[1] For the reasons set forth below, the instant appeal should be dismissed.

## PROCEDURAL AND FACTUAL HISTORY

On April 20, 2017, the Erie County Office of Children and Youth (hereinafter "OCY") filed a Dependency Petition in regards to the minor child at issue in this case, K.M.L., age 9. (*See* Dependency Petition, April 20, 2017). OCY averred the child was without proper parental care or control, alleging the following: Appellant's history with OCY due to concerns regarding sexual abuse, domestic violence, poor home conditions, failure to follow through with medical care for the minor child, inappropriate discipline, and lack of parenting skills; concerns about Appellant's mental health and her failure to treat; behavioral issues of the child that require treatment; and Appellants' lack of cooperation with OCY and service providers. *Id.* at 2.

An Adjudication Hearing was held on May 18, 2017 before the Juvenile Hearing Master. *Master's Recommendation for Adjudication and Disposition, 5/23/2017, p.* 1. Appellant

---

[1] The Honorable Senior Judge Shad Connelly presided over the involuntary termination hearing on December 16, 2019, and issued the Decree of December 30, 2019, terminating Appellant's parental rights. Senior Judge Connelly was authorized to assist the Erie County bench through December 31, 2019 until the newly-elected Judges were seated on January 1, 2020. Thereafter, this matter was reassigned to the undersigned for preparation of the 1925(a) Opinion.

1



FILED

FEB 28 2020

Register of Wills

appeared for the scheduled Hearing with counsel. *Id.* Appellant stipulated to the allegations outlined in the Dependency Petition. *Id.* All parties agreed that the Treatment Plan and placement setting were appropriate for the family at that time. *Id.* The Guardian *ad litem* agreed with the adjudication of dependency. *Id.* Thereafter, the minor child was adjudicated dependent on May 23, 2017. *Id.* The child's permanent placement goal was to remain with the parent and a three month Review Hearing was scheduled for August 7, 2017. *Id.* at 2.

The Initial Permanency Review Hearing was held on August 7, 2017. *Permanency Review Order, 8/10/2017.* At the hearing, Appellant appeared with counsel. During this review period, the Court found Appellant had been substantially compliant with the permanency plan. *Id.* at 1. It was revealed three reports of alleged abuse or neglect of the minor child had been reported to Childline (one was unfounded and two were general protective service reports). *IVT Petition, 10/4/2019* at 5. Appellant had completed the intake for the bonding assessment in early June, but did not finish the intake until the end of July. *Id.* Furthermore, although Appellant maintained contact with OCY, she failed to cooperate with Sarah Reed Partial Program, missing two scheduled meetings. *Id.* Additionally, the Sarah Reed Partial Program staff reported that they were concerned with Appellant's lack of progress and concern regarding the minor child's sexualized behaviors. *Id.* The Court ordered that the permanent placement goal was to remain with the parent and a six month Review Hearing was scheduled for February 2018. *Permanency Review Order, 8/10/2017* at 2.

The second Permanency Review Hearing was held on February 5, 2018. *Permanency Review Order, 2/9/2018.* At the time of the hearing, Appellant appeared with counsel. During this review period, the Court found Appellant had been substantially compliant with the permanency plan. *Id.* at 1. Appellant had completed the bonding assessment. *IVT Petition,*

2

*10/4/2019* at 6-7. She continued to participate in counseling three times a week with Family Based Mental Health (FBMH), continued to cooperate with Early Intervention Services, and followed through with all of the minor child's medical and dental appointments. *Id.* The Court ordered the permanent placement for the minor child to remain with the parent and a six month Review Hearing was scheduled for August 2018. *Permanency Review Order, 2/9/2018* at 2.

The third Permanency Review Hearing was held on August 10, 2018. *Permanency Review Order, 8/14/2018.* At the hearing, Appellant appeared with counsel. During this review period, the Court found Appellant had been moderately compliant with the permanency plan. *Permanency Review Order, 8/14/2018, p. 1.* Although Appellant was successfully discharged in April 2018 from FBMH Services, she failed to follow through with their recommendation to have the minor child attend Trauma-Focused Therapy. *Id.* It was reported that there had not been a noticeable improvement in Appellant's parenting skills. *Id.* The Court ordered the permanent placement goal for the minor child to remain with the parent or guardian. A six (6) month Review Hearing was scheduled for February 4, 2019. *Id.*

On September 28, 2018, an Emergency Protective Order was filed based on the following allegations: On September 23, 2018, Appellant reported the minor child received a black eye from wrestling with a sibling, however the minor child has a history of black eyes with conflicting explanations; on September 26, 2018, OCY received a report that the minor child had multiple burns on the palm of her hand and Appellant did not take the child for medical treatment nor could she offer an explanation for the injury; and on September 28, 2018, caseworkers found the home conditions concerning and Appellant reported there was no food in the home. *See Emergency Protective Order Application, 9/28/2019* at ¶ 5. The Court ordered the

3

child be removed from Appellant's care and placed in the temporary protective physical and legal custody of OCY. *Emergency Protective Order, 9/28/2019.*

On October 1, 2018, a Shelter Care Hearing was held before the Juvenile Court Hearing Officer, who found sufficient evidence was presented to prove that the continuation or return of the child to the home of Appellant was not in the best interest of the child. *Recommendation for Shelter Care*, 10/16/2018 at 1. Appellant stipulated to continued temporary foster care pending further hearings. *Id.* The child's Guardian *ad litem* also agreed to continued temporary foster care. *Id.* The following additional condition was ordered: "There shall be no visitation or contact between the child and mother pending an interview with the Children's Advocacy Center. Thereafter, visitation shall be supervised." *Id.* at 1-2.

The fourth Permanency Review Hearing was held on February 4, 2019. *Permanency Review Order, 2/7/2019.* At the time of the hearing, Appellant appeared with counsel. During this review period, the Court found Appellant had been minimally compliant with the permanency plan, and there was minimal progress toward alleviating the circumstances which necessitated the original placement of the minor child. *Id.* at 1. Appellant participated in supervised visits with the child, but continued to be inconsistent and had a difficult time engaging with the minor child, requiring redirection from inappropriate discussions with the child. *IVT Petition, 10/4/2019* at 10. Appellant had presented at one supervised visit with a swollen and bruised nose, and a report was received on November 8, 2018, regarding ongoing domestic violence in the home of Appellant and her paramour, K.B. *Id.* The Court ordered that the minor child was to remain in temporary foster care. A six month review hearing was scheduled for August 5, 2019. *Id.* at 3.

The fifth Permanency Review Hearing was held on August 5, 2019. *Permanency Review Order, 8/8/2019.* Appellant failed to appear for the scheduled hearing but her interests were represented by counsel. During this review period, Appellant continued to be minimally compliant with Court ordered services. *Id.* at 1. Appellant continued to display a negative attitude towards the minor child. *IVT Petition, 10/4/2019* at 11. Appellant had failed to actively participate in any of the services offered to her. *Id.* Of great concern, Appellant continued to reside with her paramour, K.B., who was an indicated perpetrator of sexual abuse and who had been alleged to have hit the minor child in the face on three occasions, resulting in black eyes. *Id.* The Court ordered that the minor child was to remain in foster care. *Permanency Review Order, 8/8/2019* at 2. Further, the Court ordered the permanent placement goal for the minor child to be changed to Adoption. *Id.* at 1. It was ordered that OCY was to no longer offer any services to the mother, including visitation. *Id.* at 2-3. A six month review hearing was scheduled for February 2020. *Id.* at 3.

On October 4, 2019, OCY filed a Petition for Involuntary Termination of Parental Rights (hereinafter "*IVT Petition*"), seeking to terminate the parental rights of Appellant pursuant to 23 Pa. C.S.A. §§2511(a)(1), (a)(2), (a)(5), (a)(8), and §2511(b).[2]

The trial on the IVT Petition was held on December 16, 2019. At the IVT Hearing, Appellant appeared by telephone and was represented by counsel. The following testimony was taken:

---

[2] Biological Father, S.M.H., is deceased (D.O.D.: June 9, 2015).

OCY caseworker Mary Bliley testified that she had been assigned the case in February 2018, though OCY had been providing in-home services to Appellant since April 2015. *See Involuntary Termination of Parental Rights Hearing Transcript, 12/6/2019* (hereinafter "*N.T.*") at 5. During the time period following the in-home adjudication in April 2017, Appellant, her paramour K.B., the minor child, and the minor child's sibling were residing together.[3] *N.T.* at 6. The minor child suffered injuries in the home, including three black eyes, which Appellant reported occurred as a result of the child running into a doorknob. *N.T.* at 6-7. In September 2018, the minor child appeared with a black eye and burns on the palm of her hand. *N.T.* at 7. Appellant explained that the bruise was from the child and the sibling fighting, but could not adequately explain the burn. *N.T.* at 7, *See also N.T.* at 23. The minor child claimed the burns had come from "hitting her hand on dominos," which was not consistent with the doctor's diagnosis of a second-degree burn. *N.T.* at 29. After a subsequent home visit revealed there was no food in the home, OCY filed an Emergency Protective Order on September 28, 2019 and the child was removed from the home and placed in foster care. *N.T.* at 7-8.

The caseworker testified that the minor child was having significant behavioral issues, including tantrums, aggression, and acting out sexually by exposing her genitals and simulating intercourse with dolls. *N.T.* at 8, 10. The caseworker noted there was a history of K.B. showering with the minor child and OCY had been concerned about K.B. being around the minor child. *N.T.* at 10. In fact, K.B. was indicated for sexual abuse of the minor child, after which Appellant was advised there would be barriers to reunification with the child if she continued to be in a relationship with K.B. *N.T.* at 8-9; *see also, Erie Homes for Children and Adults, Inc. Project First Step/Family Engagement, 7/17/2019* at 1. However, the caseworker reported that Appellant "continued to stand by him and say that [the minor child] was making up

---

[3] The sibling has since been transferred to his biological father's custody. *N.T.* at 6.

6

stories." *N.T.* at 9. Appellant called the minor child "a little liar" and said she made up stories. *N.T.* at 12.

At the hearing, Appellant testified, ". . . I'm not going to sit here and accuse a man that's been cleared of everything – I'm not just going to sit there and accuse him with something he has not been charged with. I don't agree with that." *N.T., p.* 46. When the Guardian *ad litem* cross-examined Appellant regarding the allegations of sexual abuse by K.B. against the minor child, Appellant attempted to explain how it wasn't possible, stating:

> . . . I will inform you guys of something that we did not find out until after my daughter was taken. Umm, they had to do a surgery on K.B. They go to find out that for years he had two torn testicles and a hernia in his surgery – or, in his stomach. He had three hernias: two in his testicles, and one in his stomach. So, if I wasn't even doing anything with him, how could he have sexually assaulted my daughter?

*N.T.* at 52-53. Appellant testified the minor child did not begin "acting very sexual towards people" until she went to kindergarten and rode the bus. *N.T.* at 53.

During cross-examination by OCY, Appellant confirmed she had no problem with K.B. because he had never been formally charged. *N.T.* at 54. When questioned whether it concerned her that the minor child was scared of K.B., Appellant testified: "And I'm not understanding why she's scare of him. He's never touched her. He's never hurt her. And the biggest thing I have with this is, until my daughter went into foster care, she had no problem with [K.B.] at all." *N.T.* at 55. At no point in time did Appellant side with the minor child over K.B. *N.T.* at 10.

After the child was removed from Appellant's care, Appellant arrived for a visit with bruising on her face and nose. *Id.* When questioned about domestic violence in the home, Appellant denied any abuse and reported she had been "hit in the face by a door at McDonald's." *N.T.* at 9-10. The caseworker testified that Appellant claimed K.B. moved out; however it appeared as though they continued to reside together. *N.T.* at 9-11; *see also, Erie Homes for*

7

*Children and Adults, Inc. Project First Step/Family Engagement*, 7/17/2019, at 2. The caseworker reported she had seen men's clothing and two brands of cigarettes inside the residence. *N.T.* at 11. She had received reports from Project First Step caseworkers that Appellant and K.B. were seen in the community together. *Id.* Additionally, the caseworker testified K.B. posted online that he was living with Appellant and they were engaged. *N.T.* at 30. As reported by the Project First Step caseworker, K.B. answered the door to Appellant's home "dressed in a t-shirt, the zipper down on his pants, flip flops, and smoking a cigarette." *Case Summary*, 8/5/2019 at 8. The caseworker testified that when Appellant was confronted about K.B. living in the home, she denied they were together and said K.B. was just repairing items in her home. *Id.*

Regarding the parent-child relationship, the caseworker testified that the minor child does not have a good relationship with Appellant, as Appellant has never aligned herself with the child or taken a protective role on behalf of the minor child. *N.T.* at 17. The caseworker reported the minor child presented with significant trauma and with significant bonding and attachment issues. *N.T.* at 28. The caseworker also noted the Bonding Assessment administered by Dr. Peter von Korff cited there was a high score of parental rejection. *N.T.* at 28.

Finally, the caseworker testified about Appellant's move to Union County in July 2019. *N.T.* at 13-16. Appellant informed the caseworker approximately two days before moving without giving an address, notifying anyone, or supplying any additional information. *N.T.* at 25-26. The caseworker confirmed that since the goal was changed in August 2019 to Adoption, Appellant had not been in contact with the caseworker. *N.T.* at 15. At that time, Appellant stated she was going to fight to get her daughter back, but failed to even contact the caseworker to see how the minor child was doing. *Id.*

OCY caseworker clinician Nicole Seelbach testified about the child's adjustment since the goal change to adoption. *N.T.* at 31. The caseworker confirmed the minor child is aware that adoption is being considered, and that the child strongly desires a "forever home." *N.T.* at 33. Specifically, the caseworker noted:

> [The minor child] wants to be adopted. She's told me numerous times that she wants a forever home. She wants a family that will love her. In her mind, she wants a family that has food in the refrigerator and in the cupboards; that they will love her; and they will play with her; and they will take her to the doctor.

*N.T.* at 33. The caseworker also reported that the minor child is scared of K.B., stating the child:

> . . . is incredibly fearful that [K.B.] will be notified of where she's living. She questioned me as to if her mother would know about her forever home, and flat-out stated she did not want them to have an address or phone number. She's scared of [K.B.], as she puts it.

*N.T.* at 34. The minor child has stated she does not want to return to Appellant. *Id.* Despite the fact an adoptive home had not been identified as of the day of the hearing, the caseworker testified she thought it was still in the child's best interests for Appellant's parental rights to be terminated. *N.T.* at 35. To further explain this position, the caseworker stated:

> . . . ". . . due to the fears that [the minor child] has expressed . . . And again, I don't bring up any of those topics. She willingly offers that information. Her fears of contact with [K.B.], especially . . . And the fact that she strongly desires these basic needs, which is not something I hear from a ten-year-old. They normally don't tell me they want a house that has food, or a house that has electricity. She deserves to have all of that stuff, and more; a family to take care of all of her needs.

*Id.*

Finally, at the close of the IVT Hearing, the Guardian *ad litem* advocated the child's best interests as follows:

> She is, tragically, really focused on finding a home where she feels safe to demonstrate that she loves her parents, and knows that they love her. She mentioned several times that she wanted a home where there's food, and specifically, a home with enough food for everyone. She wants a home with electricity and, essentially, a home where there's no yelling. Everything this child

9

says, and every behavior that this child has, points to a child who is deeply traumatized by abuse. And, quite frankly, not only is it in her best interest for [Appellant's] rights to be terminated; I think that not doing so would be incredibly damaging. Because of the lack of support from her mother – and Dr. von Korff used the perfect phrase: parental rejection – has deeply scared this child.

*N.T.* at 59.

Thereafter, the Court terminated Appellant's parental rights by Decree dated December 30, 2019. On January 27, 2020, Appellant filed a Notice of Appeal based on the Court's Decree from December 30, 2019, and concurrently filed a Concise Statement of Matters on Appeal.

## ISSUES PRESENTED

Appellant claims the Trial Court committed an abuse of discretion and/or committed an error of law when it concluded that OCY established grounds for termination of parental rights by clear and convincing evidence as to §2511(a)(2), (a)(5), (a)(8), and §2511(b). The Appellant is not contesting §2511(a)(1).[4]

---

[4] Appellant is not contesting statutory grounds have been established pursuant to 23 Pa.C.S.A. § 2511(a)(1), therefore the Court need only find that OCY met its burden of clear and convincing evidence as to 23 Pa.C.S.A. § 2511(b). *See In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010); *In re Adoption of R.J.S.*, 901 A.2d 502, 508 n.3 (Pa. Super. 2006).

10

## STANDARD OF REVIEW

In reviewing an appeal from an order terminating parental rights,

> Appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for parental rights. [The] standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.,* *608 Pa. 9, 9 A.3d 1179, 1190 (2010).*

> If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.* An abuse of discretion does not result merely because the reviewing court might have reached a conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

## DISCUSSION

In relevant part, 23 Pa.C.S.A. § 2511 provides:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . .

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. . .

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement

11

of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child . . .

(b) **Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . .

"Parental rights may be involuntarily terminated where any single subsection of §2511(a) is satisfied, along with consideration of § 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Thus, termination of parental rights requires the Court to engage in a bifurcated process. *In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa. Super. 2006) (citing *In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004)). First, OCY ". . . must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re B.L.L.*, 787 A.2d at 1013-14. If the Court determines one of the statutory grounds have been established, the Court must then consider the requirements of Section 2511(b) and make a ". . . determination of the needs and welfare of the child under the standard of best interests of the child." *In re Adoption of R.J.S.*, 901 A.2d at 508 (citations omitted). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child." *Id.* However, the emotional bond is ". . . nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re G.M.S.*, 193 A.3d 395, 401 (Pa. Super. 2018). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id.* (citing *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015)). "Additionally . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child." *Id.*

12

In the case *sub judice*, as noted, Appellant does not challenge the Court's finding that grounds for termination have been established under § 2511(a)(1). Therefore, the only issue before the Court is whether OCY proved by clear and convincing evidence that termination of Appellant's parental rights best meets the needs and welfare of the minor child under § 2511(b). Appellant claims the Court "did not consider the trauma and impact that befalls a child upon severing the established bond between the natural mother and the minor child and how permanently severing that relationship was in the best interests of the minor children." *See Appellant's 1925(b) Statement* at 2. This claim is without factual or legal merit.

Contrary to Appellant's claim, the Court did consider "the importance of continuity of relationships" and whether the child would be traumatized by severing any existing parent-child bond. It is certainly not lost on the Court that Appellant moved out of county in July 2019 and failed to provide contact information or attempt to continue any relationship with the child. *See N.T.* at 13-16. Appellant made no plans to continue visitations or attempts to transfer the case, and failed to contact OCY in any manner to inquire about the child. *N.T.* at 14-15. Further, the evidence established any bond that may exist between the child and the Appellant can be severed without detrimental effects on the child.

As part of the permanency plan, Appellant participated in a bonding assessment with Peter von Korff, Ph.D. *See Master's Recommendation for Adjudication and Disposition, 5/23/2017, p.* 1. At the conclusion of the bonding assessment, Dr. von Korff issued a report, noting that Appellant had not made much progress between the fall of 2017 through June 2019 in her "development as an informed parent." *See Bonding Assessment 7/15/ 2019* at 12. Dr. von Korff also found that Appellant interacted with the minor child in a reactive manner, "managing

13

each passing moment with as much tolerance as she could muster." *Id.* Dr. von Korff concluded:

> The writer does not see [Appellant] as a viable parenting resource for her child. [The minor child] remains deeply troubled and in need of skillful, attentive and consistent parenting. She evidences a disorganized attachment state of mind and presents with a mixture of endearing, problematic, impulsive and proactive behaviors that would challenge parental figures who are far more advanced in their skills, more unconditionally loving, and more consistent than [Appellant].

*Id.* at 13. The Court found it was clear from the evidence presented that severing any feasible parent-child bond would not be detrimental to the child.

Next, the Court considered whether termination of Appellant's parental rights is the best for the child's safety. Appellant's actions did not reflect someone who was engaging in safe or appropriate relationships. Despite being told K.B. was not safe to be around the minor child, Appellant continued to live with him. *N.T.* at 9-11; *see also, Erie Homes for Children and Adults, Inc. Project First Step/Family Engagement, 7/17/2019,* p. 2. As reported by the OCY caseworker and as demonstrated by Appellant herself during the IVT hearing, she continues to minimize the situation with K.B. and chooses K.B. at the expense of the child's safety. Appellant chooses to believe the minor child's sexual behaviors came from riding the bus to school in kindergarten. *N.T.* at 53-54. When Appellant was told the minor child was scared of K.B., Appellant deflected the claim and blamed the foster home. *N.T.* at 55. Further, when the minor child was residing in the home with Appellant and K.B., there were a number of unexplained injuries for which Appellant failed to provide adequate explanation. *N.T.* at 6-8; 23. Appellant also appeared to be a victim of domestic violence but remained in denial. *N.T.* at 9-10. In consideration of Appellant's complete lack of protection of the minor child, the Court found terminating Appellant's parental rights best met the child's needs and welfare.

14

Lastly, the Court considered whether termination of Appellant's parental rights best meets the child's needs for love, comfort, security, and stability. The testimony and evidence presented at the IVT hearing clearly established termination of Appellant's parental rights is in the best interest of the minor child. As reported by Project First Step, the child has special "cognitive limitations and emotional needs that require patience and a true understanding of the demands associated with these needs." *Erie Homes for Children and Adults, Inc. Project First Step/Family Engagement, 7/17/2019* at 3. Appellant has failed to understand, or even acknowledge, that services such as trauma therapy are necessary. *Id.* Moreover, Ms. Seelbach's testimony confirmed that the minor child feels safe, secure, and stable in placement. *N.T.* at 35. It is striking that the minor child recognized that adoption would provide her with the basic needs she lacked in Appellant's care, such as food, medical care, and electricity. The minor child has repeatedly stated she would like to be adopted, and has begged that Appellant and/or K.B. not be given her contact information. *N.T.* at 33-34. Based on the above, the Court found termination of Appellant's parental rights best met the child's needs for love, comfort, security, and stability.

After full consideration of the needs and welfare of the child pursuant to § 2511(b), the Court found it was in the best interest of the child to involuntary terminate the Appellant's parental rights

15

## CONCLUSION

A review of the record reflects, there are no issues of merit and OCY met its burden in establishing grounds for termination of Appellant's parental rights under 23 Pa. C.S.A. §2511(a)(1), (a)(2), (a)(5), (a)(8)[5], and §2511(b) by clear and convincing evidence. It is therefore respectfully requested that the Superior Court affirm the Decree of December 30, 2019.

BY THE COURT:

Hon. John J. Trucilla, President Judge

cc:    Kevin Jennings, Esq., Office of Children and Youth
Emily Merski, Esquire

---

[5] As discussed, OCY need only establish one statutory ground to satisfy the first prong of the analysis and Appellant concedes OCY has met subsection (a)(1). Therefore, this Opinion does not address Appellant's challenges to subsections (a)(2), (a)(5), and (a)(8). However, the Court also finds OCY has met its burden of proof of clear and convincing evidence pursuant to 23 Pa.C.S.A.§ 2511(a)(2),(a)(5), and (a)(8).

16